And our next case this morning is McFadden v. Berryhill. Mr. Schultz, come on back up. And may it please the court, your honors, Barry Schultz on behalf of the appellant Danny McFadden. The plaintiff argued three separate issues to this court, but in reviewing the matter for oral argument, the plaintiff decided that he would withdraw the second issue, which is in section C of the brief and reply brief. If we did, I did submit something, I don't know if your honors received it on Friday indicating that I was not going to be pursuing that second issue. In this case, the ALJ erred by failing to give good reasons for not giving controlling weight to treating Dr. Acasano's opinion and failing to follow the regulatory checklist of factors that is, I believe, familiar to this court now in weighing that opinion. Most critically, the ALJ rejected Dr. Acasano's opinion because it was placed on a checklist form and that on that form the doctor did not indicate the impairments that he was relying on or the symptoms and diagnostic tests that supported his opinion. Although the doctor actually does include some of the findings that he relied on. Where would those be? This is just a list with things to circle. Yes, that's true. There isn't a qualitative analysis. No, there's not. At page 821, though, it does ask the doctor to indicate the objective signs of pain and he does check off some signs. But that's really not the basis for a plaintiff's argument. As this court held in the Larson v. Astru case, while a check off box opinion form by itself may not be entitled to significant weight, where it's supported by significant treatment records, then the opinion should be given more significance. And that's what we're really dealing with here is that Dr. Acasano's opinion should have been considered based on the treatment records that exist in the record. While we don't have 180 treatment visits in this case, there are at least 40 treatment visits over about a four-year period of time, which is quite a few times seeing a primary care physician 10 times a year for four years is fairly significant. And Dr. Acasano's treatment notes are very detailed. They outline the complaints of Mr. McFadden when he came in. They outline the doctor's observations and examination results. They outline the prescriptions or treatment that the doctor prescribed. And that goes on over this four-year period of time. So that's what the ALJ should have considered. It's clear that Dr. Acasano treated Mr. McFadden for diabetes, which was often uncontrolled, for his varicose vein situation, which caused significant problems in his legs, for his knee arthritis, for frequent urinary tract infections. Dr. Acasano's treatment notes always reflect that Mr. McFadden was level 3 obesity, was considered extreme obesity. Early on, he was very close to extreme obesity, but for most of the period of time, he had a body mass index over 40. Do the treatment notes corroborate his assessment that Mr. McFadden suffered from severe pain? He rates the, on this checklist, he circles severe pain, and I'm not sure the treatment notes bear that out. Well the treatment notes, some of the treatment notes do, actually, concerning the varicose vein situation. But Dr. Acasano also referred Mr. McFadden to many specialists, and one of the pain management doctors, Dr. Sharma, indicated that Mr. McFadden needed, or was recommended for, consideration of bilateral knee replacement. So I think that does suggest that that supports Dr. Acasano's final opinion there. And if you look at those specialist opinions, which includes the vascular doctor, Dr. Cardone, the orthopedic doctor, Dr. Wideman, the podiatrist, Dr. McIvor, they all note that Dr. Acasano was the referring physician. So he would have been aware of these doctors' recommendations and the treatment. And Mr. McFadden had surgery on his left knee and on his right knee, but even after that, it was then recommended that he needed bilateral knee replacement. He had an ablation procedure on his varicose veins because of severe fatigue and heaviness and pain in his legs. And then he went back to the doctor because he was having recurring symptoms. The doctor noted a return of the varicose vein problem. And then a year after that, he had to undergo another ablation procedure because the condition had increased and gotten worse again. He was regularly getting debridement of his feet by his podiatrist, which I believe is related to the diabetes condition. And of course, his extreme obesity almost by itself, or in addition considered in combination with the knee problems and the vein problems, would support Dr. Acasano's opinion given Social Security Ruling 02-1P, which talks all about obesity and how it can impact musculoskeletal impairments and other impairments and cause exacerbation of those conditions. If ALJ thought that because of the checklist form, she couldn't tell why Dr. Acasano provided the opinion that he did, under Barnett v. Barnhart, this court's case, the ALJ should have contacted Dr. Acasano or asked the plaintiff's representative to contact the doctor to get the explanation that the ALJ thought was lacking rather than just to reject this treating doctor's opinion because the report itself didn't include all the information that the ALJ wanted to see. In particular, Mr. McFadden testified that he elevated his legs multiple times a day in order to relieve the pain and swelling. And Dr. Acasano gave an opinion that Mr. McFadden had to elevate his legs during the day. And the vocational expert testified that if Mr. McFadden had to elevate his legs, then he was unemployable. There were no jobs that he could perform. The ALJ rejected that opinion, saying there is no support for it. But yet, there is support for it, given the treating doctor's opinion, the plaintiff's testimony, as well as the combination of impairments. Again, extreme obesity, severe varicose vein condition, severe serious knee arthritis. That would give a basis for Mr. McFadden to be required to elevate his legs. I thought the leg elevation instructions were post-surgical and temporary. It wasn't a permanent kind of instruction. Dr. Cardone, right, after surgery, did instruct Mr. McFadden to elevate his legs for post-surgical treatment. Right. So what's the basis for Dr. Acasano? What's the basis for his treatment? What's his instruction or recommendation that he needs to elevate his legs frequently? Well, he doesn't explain. But again, the plaintiff is extremely obese and had this continuous varicose vein problem and arthritic problem. And Mr. McFadden testified that his legs continued to swell and he continued to have pain, and that only elevating the legs relieved those symptoms. Now, Dr. Cardone, the vascular doctor, he did not give an opinion after the initial instruction, the discharge instructions. He didn't say that to Mr. McFadden, you no longer have to elevate your legs. It's just not a follow-up opinion from him. But again, I think Dr. Acasano's opinion is exactly the type of opinion that the treating physician rule or regulations was meant to deal with. You have a doctor who was very concerned about his impairments. Four years' worth of treatment notes, very detailed. Right. I don't think that's the problem here. The problem is that he really didn't offer any explanation. And the severity of his findings in this checklist are not really borne out by his treatment notes, at least not on a consistent basis. So without further explanation from him, it's hard to see what he's basing those severe findings on. And that's why I cited the Barnett case, because if the ALJ wondered why this doctor was giving the opinions that he did, it would have been easy enough for him to ask or ask the representative to get a follow-up opinion from the doctor. But not required to. The regulation that Barnett was based on was gone by the time of this hearing? It's still under the 20 CFR 404.15.27. This doctor's opinion was still entitled to greater weight than any non-examining doctor's opinion, so I still think that the rationale behind Barnett should hold. Thank you. Thank you. Ms. Siegel. Good morning, Your Honors. My name is Catherine Siegel. I represent the Acting Commissioner of Social Security in this case. As an initial matter, I would just like to point out that many of the arguments that Mr. Schultz is making today are new arguments before the appellate court for the first time that the claimant's attorney did not make before the district court, and he can't raise them at this point in the appellate court without raising them first in the district court. And it's specifically challenging the reasons for discounting Dr. Okusana's opinion that was never raised in the district court. The district court brief talked about a sit-stand option not being adequately explained, the ALJ and the RFC finding. To the extent that he referenced Dr. Okusana, he just says that it should be given, that opinion should be given controlling weight because it was from a treating physician who had treated the claimant for four years. He does not challenge the specific reasons that the ALJ gave in his analysis of that treating physician opinion. But the argument was made that the treating doctor, Dr. Okusana's opinion should have been given controlling weight, so isn't that enough to preserve the issue even though it's more robustly developed here? Well, except that it was so little development at the district court level, it really wasn't raised. I mean, it wasn't raised to the extent that he can now expand on it to this extent where he's going into each and every factor that the ALJ considered and criticizing them. He never raised any of those criticisms in the district court, so our position is that he forfeited those. And then the other arguments he just abandoned, except for the appeals council evidence, which he didn't really develop much either. With regard to Dr. Okusana's opinion, the ALJ did give good reasons. He does not have to give, or she did not have to give, controlling weight unless that opinion is well-supported by the record. And the ALJ did find that it was not well-supported by the objective medical evidence and that it was inconsistent with other substantial evidence in the record. And one of the things that the ALJ expected Dr. Okusana to do was to explain the reasons for these very, very extreme limits. Some of the limits are just absolutely not supported, like the limit on fine manipulation with either hand. The doctor said there was never any limit, said that there was no amount of weight that the claimant could frequently lift, that it could only sit for 15 minutes and for two hours total. And those kinds of findings are absolutely not borne out by the record. And plaintiff's counsel cites to the doctor's treatment notes and said that the ALJ should have looked to those for the answers or the But if you do look at that part of the record, and especially pertaining to the period of time when Dr. Okusana gave this opinion in May of 2013, those records do not show limits on lifting at all. They say that the claimant had normal strength and normal grip on exam. That's at page 762 of the record. That's in May of 2013, right around the same time as that opinion was given. The doctor also finds no gait abnormality, and yet in this opinion he's talking about standing limits that are 15 minutes at a time. It's just not borne out by the objective findings in the treatment records. And while he does talk about a lump on the claimant's wrist, which turned out to be diagnosed as a ganglion cyst, that finding was made at the same time that the doctor said that there were no restrictions on strength or on grip. So clearly that condition did not affect the claimant's gripping strength and his fine manipulation to the extent that the doctor indicated on the form. So those things are record evidence, objective evidence, that supported the ALJ's conclusion that there wasn't a good enough reason to have these kinds of extreme limitations on the claimant. On the other hand, the ALJ did consider an examining physician's opinion and two state agency physician opinions, and they gave a lot of findings that were consistent with their conclusions that the claimant could do a range of light work. As far as the question of not giving an explanation and that he wasn't required to do so because they didn't ask him to do so, that's really not accurate because in the report itself at the bottom it says, please provide additional details. So even on that form itself on page 822, the form asks for additional details, and there's six lines, and they're just left completely blank. So the doctor was kind of given a little hint that he should be putting some information in there to explain the opinion, and yet he chose not to do that. So that's more than a hint. Pardon me? It's more than a hint. Right, exactly. I mean, it's please provide additional details. It doesn't get any clearer than that. I mean, so it was reasonable for the ALJ to expect that kind of explanation, and when it wasn't here, I mean, that was a reasonable basis for considering one, giving it less weight. As far as the different objective findings, the ALJ did go through the record and consider lots of different things about the claimant's treatment. Earlier in the decision, when they were doing the general discussion of the evidence that supported her findings, she did talk about the arthroscopic surgery and noted that the claimant had excellent results after both of those surgeries. In fact, they did the left knee first and had such a good result then they suggested doing the right knee. It was repairing a torn meniscal tear in the knee. Although they talked about knee replacement surgery, the claimant was deemed to be too young and they abandoned that treatment possibility. So there never was any knee replacement surgery and it doesn't seem like that's something that was considered by the doctors again. As far as the vein ablation surgeries or the procedures, the vein ablation surgeries also were successful and had excellent results. And he, again, did a few of them when he had each time that he had a good result, he did another vein. And although he had to elevate his legs for a short time after each procedure, that was not an ongoing limit. And the suggestion that he would have to frequently elevate his legs because of leg swelling is also not supported by the record. Because when he did have leg swelling, his doctors actually told him to engage in activities. He was told that he should do a home exercise program, aquatic exercise, and he should lose weight to reduce swelling in his legs. They did not mention leg elevation for swelling reduction just in the regular medical records. And you can see examples of that at 648 and 651 of the record. Silence. Great. Thank you. Pardon me? I said if silence is pregnant, it's a possibility. I was just considering what other points were brought up. You brought up things to say. That's the time to shut up. Well, there was a lot covered by Mr. Schultz. I wanted to make sure I wasn't missing some points that he made. Is there anything apparent to you that I haven't answered that you have any questions about? The scope of the appeal has been substantially narrowed. Okay. All right. 28J. Then I will just ask the court to affirm the ALJ's decision. Thank you. Thank you. Mr. Schultz. The only thing I would point out, Your Honors, is that in reference to the consultative doctor, Dr. Lum, page 19 of the ALJ's decision, the ALJ actually summarizes what Dr. Lum found, which was an antalgic gait, morbidly obese, Mr. McFadden relied heavily on his cane, there was bilateral crepitus with laxities in the knees, pain with extension and flexion. In addition, Dr. Lum only did not give an opinion as to how much Mr. McFadden could do over an eight-hour day. He said he could stand for 10 to 15 minutes, lift 10 to 15 pounds, but he never opined that he could do that for an extended period. Thank you very much, Your Honor. Thank you. The case is taken under advisement. Our thanks to both counsel.